UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

QUALITY AUTOMOTIVE
SERVICES, LLC,

        *Plaintiff*,

        v.

PENSION BENEFIT GUARANTY
CORPORATION,

        *Defendant*.

Civil Action No. 12-1503 (ESH)

## MEMORANDUM OPINION

Plaintiff Quality Automotive Services, LLC ("QAS") has sued the Pension Benefit Guaranty Corporation ("PBGC"), challenging its determination of "substantial damage" to the Freight Drivers and Helpers Local No. 557 Pension Fund as arbitrary and capricious. Before the Court are plaintiff's Motion for Summary Judgment (Mar. 13, 2013 [ECF No. 15] ("Pl.'s Mot.")) and defendant's Cross-Motion for Summary Judgment (Apr. 12, 2013 [ECF No. 17] ("Def.'s Mot.")). For the reasons set forth below, plaintiff's motion will be denied, and defendant's motion will be granted.

### BACKGROUND

**I.    STATUTORY FRAMEWORK**

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381 *et seq.*, seeks to protect the viability of multiemployer pension plans. It provides that when a contributing employer withdraws from a multiemployer pension plan, that employer

1

owes withdrawal liability in the amount of its share of the plan's unfunded vested benefits. *See* 29 U.S.C. § 1381. However, there are a number of exceptions to that rule, including one for withdrawals from plans that receive contributions primarily from employers engaged in the trucking industry. *See id.* § 1383(d). Under this "trucking industry exception," a withdrawal occurs—and withdrawal liability is incurred—only if:

> (A) an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan, and
> (B) either:
> > (i) [PBGC] determines that the plan *has suffered substantial damage to its contribution base as a result of such cessation*, or
> > (ii) the employer fails to furnish a bond issued by a corporate surety company that is an acceptable surety for purposes of section 1112 of this title, or an amount held in escrow by a bank or similar financial institution satisfactory to the plan, in an amount equal to 50 percent of the withdrawal liability of the employer.

*Id.* § 1383(d)(3) (emphasis added). The statute goes on to state:

> If, after an employer furnishes a bond or escrow to a plan under paragraph (3)(B)(ii), [PBGC] determines that *the cessation of the employer's obligation to contribute under the plan (considered together with any cessations by other employers), or cessation of covered operations under the plan, has resulted in substantial damage to the contribution base of the plan*, the employer shall be treated as having withdrawn from the plan on the date on which the obligation to contribute or covered operations ceased, and such bond or escrow shall be paid to the plan. [PBGC] shall not make a determination under this paragraph more than 60 months after the date on which such obligation to contribute or covered operations ceased.

*Id.* § 1383(d)(4) (emphasis added).

## II. FACTUAL BACKGROUND

CSX Corporation owns an intermodal railroad loading and unloading facility in Jessup, Maryland, called the Annapolis Junction Facility. (Administrative Record [ECF Nos. 6-10, 13] ("AR") at 1, 1378.) Total Distribution Services, Inc. ("TDI"), a subsidiary of CSX Corporation, hires subcontractors to operate the facility. (*Id.* at 1385.) Beginning in August 2005, QAS began

operating the facility as a subcontractor for TDI. (*Id.* at 1378, 1385.) QAS signed a collective bargaining agreement with Freight Drivers and Helpers Local Union No. 557 ("Local 557") and employed members of Local 557 at the facility. (*Id.* at 1, 1378, 1385.) Pursuant to the terms of the collective bargaining agreement, QAS contributed to the Freight Drivers and Helpers Local No. 557 Pension Fund ("the Fund") based on the number of hours worked by its union employees. (*Id.* at 1, 1378.)

Effective July 31, 2007, TDI replaced QAS with another subcontractor, Annapolis Junction Rail Solutions ("AJRS"). (*Id.* at 1378-79, 2084.) At that time, QAS ceased to have any obligation to contribute to the Fund. (*Id.* at 6, 1411, 1379.) As QAS had done, AJRS signed the Local 557 collective bargaining agreement, hired members of Local 557, and began contributing to the Fund. (*Id.* at 1379, 2084.)

On December 3, 2009, the Fund assessed withdrawal liability against QAS in the amount of $2,045,014. (*Id.* at 6, 1438, 2081, 2083.) Thereafter, QAS's parent company, MCS Properties, LLC, deposited 50% of the assessed withdrawal liability in escrow. (*Id.* at 6-7 & n.6, 1379, 1758.)

On September 30, 2011, QAS requested a determination from PBGC that its departure from the Fund had not caused "substantial damage" to the Fund's contribution base. (*Id.* at 1378-82.) QAS argued that "its substitution with AJRS did not result in substantial damage to the Fund's contribution base because, *inter alia*, AJRS continued to contribute to the Fund on behalf of a similar number of employees as QAS did before it." (Pl.'s Mot. at 9 (citing AR at 1378-82, 2085-143).)

On January 27, 2012, the Fund urged PBGC to reject QAS's position and to conclude that QAS's exit had caused the Fund's contribution base to suffer substantial damage because

3

AJRS's replacement of QAS as a contributing employer was not the relevant inquiry, but rather, PBGC should focus on the decline in the overall financial condition of the Fund since 2000. (AR at 1-25.)

On July 31, 2012, exactly 60 months after QAS ceased its obligation to contribute to the plan, PBGC determined that "[QAS's] cessation of covered operations on July 31, 2007, substantially damaged the contribution base of the Fund." (*Id.* at 2075.) The determination stated that it was based on "the cessation of contributions by both the employer under consideration and all other employers that have ceased contributing to the plan prior to the date PBGC's determination must be made." (*Id.*) The determination also noted that in previous such determinations, PBGC had also considered "the plan's overall financial health and its benefit cost structure." (*Id.*) PBGC based its determination of substantial damage on numerous financial metrics of the Fund's overall health, including the recent decreases in contribution base units, contributing employers, number of active participants, and ratio of inactive to active participants, as well as the increase in employers' annual cost of benefits. (*Id.* at 2076).

As correctly recognized by plaintiff, there is only one issue presented by this case: did PBGC correctly determine that QAS's cessation of covered operations "resulted in substantial damage" to the Fund's contribution base? (Pl.'s Mot. at 6 (quoting 29 U.S.C. § 1383(d)(4)).) To decide this issue of statutory interpretation, the Court must decide whether PBGC's determination was arbitrary and capricious and contrary to law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), because it relied on the cumulative effect of the cessations of all withdrawn employers, as opposed to the effect of the cessation of the exiting employer—QAS. (Pl.'s Mot. at 12-13.)

4

## LEGAL FRAMEWORK

### I. MOTION FOR SUMMARY JUDGMENT

Normally, a motion for summary judgment under Rule 56 shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "In a case involving review of a final agency action under the [APA], however, the standard set forth in Rule 56[] does not apply because of the limited role of a court in reviewing the administrative record." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) (citation omitted). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* at 90 (quoting *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769-70 (9th Cir. 1985)).

### II. ARBITRARY AND CAPRICIOUS STANDARD

The APA provides that the reviewing court shall set aside an agency action that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706. An agency action is "arbitrary and capricious" if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

At its core, "to survive arbitrary and capricious review, an agency action must be the product of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012). The arbitrary and capricious standard of review is highly deferential; the reviewing court will "defer to the wisdom of the agency, provided its decision is reasoned and rational." *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (citations and quotation marks omitted); *see also Fox*, 684 F.3d at 74-75 (review is "fundamentally deferential," determining only whether process was "logical and rational" (citing *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006))).

## III. *CHEVRON* DEFERENCE

As a general rule, when reviewing an agency's interpretation of the statute which that agency administers, courts apply the familiar two-part framework announced in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). *See Fox*, 684 F.3d at 75. In the first step, the Court asks "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If the statutory language is unambiguous and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. However, "if the statute is silent or ambiguous with respect to the specific issue," the Court will proceed to step two of the *Chevron* analysis and ask whether the agency's interpretation is "permissible." *Id.* at 843. At this step, the interpretation is "given controlling weight unless" it is "manifestly contrary to the statute." *Id.* at 844. The question at this step "is not whether the [plaintiff's] proposed alternative is an acceptable policy option but whether the [agency action] reflects a reasonable interpretation of [the statute]." *Coal. for Common Sense in Gov't Procurement v. United States*, 707 F.3d 311, 317 (D.C. Cir. 2013). As the Supreme Court recently explained, "*Chevron* thus

6

provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency." *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013).

**ANALYSIS**

I.  **PBGC'S CONSIDERATION OF THE CUMULATIVE IMPACT OF ALL EMPLOYER CESSATIONS**

Plaintiff's first argument is that PBGC's determination was arbitrary and capricious because it was contrary to the plain language of the statute. (*See* Pl.'s Mot. at 13-16.) Specifically, plaintiff claims that the statute requires PBGC to consider "the effect of the cessation of *the exiting employer*, not the cumulative effect of the cessations of other employers to the *exclusion* of the exiting employer." (*Id.* at 14.) Thus, because PBGC acknowledged that it based its determination on the "cumulative effect of all withdrawn employers rather than the withdrawal of [QAS specifically]" (AR at 1411), plaintiff asserts that PBGC violated "both the plain language and intent of the statute." (Pl.'s Mot. at 15.)

The Court disagrees. As an initial matter, the plain language of the statute is ambiguous as to what the agency is to consider. First, in section (d)(3), the statute appears to endorse plaintiff's view of the issue; that section provides that a withdrawal "only occurs" if the agency finds that "the plan has suffered substantial damage to its contribution base as a result of *such cessation*." 29 U.S.C. § 1383(d)(3) (emphasis added). That language suggests that the agency must determine the impact on the plan's contribution base that is attributable only to the departure of the exiting employer. However, in the very next section, the statute suggests the opposite and instructs the agency to treat an employer as having withdrawn from the plan if that employer's cessation, "considered together with any cessations by other employers," has substantially damaged the plan's contribution base. *Id.* § 1383(d)(4). Nowhere does the statute

7

explain how these seemingly inconsistent sections are to be reconciled. But at a minimum, the Court cannot conclude that Congress' intent is "unambiguously expressed," *Chevron*, 467 U.S. at 843, so it must proceed to *Chevron*'s step two to determine whether the agency's interpretation is permissible as a "reasonable interpretation" of the statute. *Coal. for Common Sense in Gov't Procurement*, 707 F.3d at 317.

In order to answer this question, the Court must first decide what the agency's interpretation of the statute was in this case. Plaintiff contends that PBGC considered the cumulative effect of all prior employer cessations *to the exclusion* of the exiting employer. (Pl.'s Mot. at 14.) However, an examination of the Administrative Record reveals that that is not an accurate portrayal of what happened. In its determination, PBGC clearly stated that it had considered "the impact of the cessation of contributions by both *the employer under consideration* and all other employers that have ceased contributing to the plan prior to the date PBGC's determination must be made." (AR at 2075 (emphasis added).) PBGC then concluded that "*Quality's cessation*, along with the cessation of all other employers through this date, substantially damaged the Fund's contribution base." (*Id.* at 2076 (emphasis added).) And indeed, one of the reasons given for that conclusion was that "Quality was a 3.9% contributor at the time of its withdrawal in 2007." (*Id.*) Thus, while its reasoning could have been more clearly stated, the determination does reflect consideration of the effect of QAS's departure on the contribution base. That conclusion is bolstered by PBGC's Executive Summary Memorandum, prepared by the Assistant Chief Counsel and an attorney in the Office of the Chief Counsel, which sets forth in detail the agency's rationale for its determination and its understanding of § 4203(d) of ERISA. (AR at 1437-42.) In that memorandum, a section of the analysis is entitled "Quality's Withdrawal," in which the agency again noted the percentage of

the contribution base that QAS accounted for and stated that "the relevant analysis in this case is whether Quality's cessation in conjunction with other cessations substantially damaged the Fund." (*Id.* at 1441-42.) In their internal memorandum, the PBGC lawyers also recognized that

> [T]he relevant analysis in this case is whether Quality's cessation in conjunction with other cessations substantially damaged the Fund. And here, the combined cessations caused such damage, regardless of the addition of an employer "replacing" Quality.
>
> The Fund's declining contribution base and general financial distress demonstrate the substantial damage imposed by the cessation of Quality and other employers and direct against applying the trucking exception to the normal imposition of withdrawal liability.

(AR at 1442.) Moreover, in both that internal memorandum and in the final determination, the agency considered the financial condition of the Fund from roughly 1999 to 2011, which extends both prior to and after QAS's cessation. (*See id.* at 1439-41, 2075.) Changes to the Fund's contribution base occurring after QAS's cessation in July 2007 could be attributed, at least in part, to QAS's departure. In short, PBGC interpreted the statute as requiring it to consider the cumulative effect of all employer cessations, *including* QAS.

With that understanding in mind, the Court can comfortably conclude that the agency's interpretation of the statute is reasonable. As explained above, section (d)(4) of the statute clearly instructs the agency to consider the impact of the cessation of the employer in question "together with any cessations by other employers." 29 U.S.C. § 1383(d)(4). Thus, far from being "manifestly contrary to the statute," *Chevron*, 467 U.S. at 844, PBGC's interpretation represents a reasonable reading of the statute.[1]

---

[1] In reaching this conclusion, the Court does not adopt PBGC's argument that once it has determined that a fund has been substantially damaged by the withdrawal of one contributing employer, as PBGC did when U.S.F. Red Star, Inc. ("Red Star") withdrew in 2009 (*see* Def.'s Mot. at 14 (citing AR at 1443-49)), the trucking plan exception no longer applies to future cessations by other employers. (*See* Def.'s Mot. at 5; PBGC's Response to Plaintiff's Motion for

## II.     CONSISTENCY WITH PRIOR AGENCY PRECEDENT

QAS next argues that PBGC's determination was arbitrary and capricious because it improperly departed, without explanation, from prior agency precedent. (Pl.'s Mot. at 16-17.) Specifically, QAS claims that PBGC deviated from its prior opinions relating to the trucking industry exception in two ways: (1) by pursuing a "cumulative only" approach rather than directly analyzing the impact of QAS's cessation; and (2) by expanding the time period during which other employers' cessations were considered. (*See id.* at 18.) The Court disagrees that either of these approaches represents a departure from the agency's prior precedents.

With respect to the "cumulative only" approach, the Court concludes that PBGC has been consistent in its consideration of other employers' cessations. Prior to this determination, PBGC has issued four other determinations regarding "substantial damage" to a plan under the trucking industry exception. *See Determination of Substantial Damage with Respect to Cessation of Contributions by DeHart Motor Lines, Inc., and United News Transp. Co. to Trucking*

---

Summary Judgment, Apr. 12, 2013 [ECF No. 16] ("Def.'s Opp'n") at 4.) This interpretation does not appear to have any support in the statute, but more importantly, this rationale was not relied on by the agency at the time it issued its determination. A reviewing court "may not accept appellate counsel's *post hoc* rationalizations for agency action." *State Farm*, 463 U.S. at 50. Instead, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*

Nonetheless, as a practical matter, PBGC's argument regarding the inapplicability of the trucking plan exception once there is a prior finding of substantial damage by the withdrawal of one contributing employer would produce the same outcome as the one reached here. In 2009, PBGC determined that Red Star's departure, *together with* other previous cessations, had substantially damaged the Fund. (AR at 1443-49.) Then, a mere three years later, PBGC undertook to determine whether QAS's cessation, *together with* those same previous cessations—including Red Star's—had left the Fund substantially damaged. Barring some dramatic turnaround in those intervening three years, the addition of yet another employer's cessation to a plan that was already substantially damaged will almost always lead to the conclusion that the plan remains substantially damaged. However, the mere likelihood that the exception would be found not to apply in a particular case does not justify eliminating the application of the exception altogether. Rather, it is only by conducting the requisite analysis that the agency can determine whether a plan has indeed recovered.

*Employees of North Jersey Welfare Fund, Local 641* ("*DeHart*"), 50 Fed. Reg. 36,171 (Sept. 5, 1985); *Request for Determination of Substantial Damage with Respect to Cessation of Contributions by Pioneer Paper Stock to Freight Drivers and Helpers Local 557 Pension Fund* ("*Pioneer Paper Stock*"), 52 Fed. Reg. 28,881 (Aug. 4, 1987); *Request for Determination of Substantial Damage with Respect to the Cessation of the Obligation to Contribute by Kane Transfer Co. to the Freight Drivers and Helpers Local Union No. 557 Pension Fund* ("*Kane*"), 63 Fed. Reg. 1,511 (Jan. 9, 1998); *Freight Drivers and Helpers Local Union No. 557 Pension Plan Request for Substantial Damage Determination Relating to USF Red Star, Inc.* ("*Red Star*") (May 22, 2009) (AR at 1443-49) (unpublished). In those determinations, PBGC has consistently stated that it considers each cessation "within the context of other cessations under the same plan." *See Pioneer Paper Stock*, 52 Fed. Reg. at 28,882; *DeHart*, 50 Fed. Reg. at 36,171; *Red Star*, AR at 1445. The difference between considering an employer's withdrawal "within the context of" other cessations—as was done in previous cases—and considering "the impact of contributions by both the exiting employer and all other employers that have ceased contributing to the plan"—as was done here (*see* AR at 2075)—is one of semantics, not substance.

And indeed, PBGC's prior determinations have consistently focused on the overall financial health of the plan in question, as affected not only by the departure of the exiting employer, but also by other employer cessations and other market factors. In fact, with respect to three of the four previous determinations, PBGC made no finding whatsoever as to the departing employer's direct impact on the plan's contribution base, but instead, it focused only on the plan's overall financial health. *See DeHart*, 50 Fed. Reg. at 36,171; *Pioneer Paper Stock*, 52 Fed. Reg. at 28, 881; *Kane*, 63 Fed. Reg. at 1,512. That is exactly what PBGC did in this

11

case. Therefore, there is no support for the claim that PBGC "disregarded its prior precedents." (Pl.'s Mot. at 17.)[2]

The same conclusion applies to the time period PBGC considered in analyzing other employer cessations. QAS claims that all of PBGC's prior determinations evaluated employer cessations over a time period that "correlated meaningfully with the date of the cessation in question," while in this case the agency considered data "spanning a full decade." (*Id.* at 19.) A review of the relevant precedents, however, reveals that PBGC has been consistent in its approach to substantial damage determinations. First, PBGC has often acknowledged that the 60-month limitation on "substantial damage" determinations found in 29 U.S.C. § 1983(d)(4) effectively sets the end date of its determination at five years post-departure. *See DeHart*, 50 Fed. Reg. at 36,171; *Pioneer Paper Stock*, 52 Fed. Reg. at 28,882. With respect to the start date, PBGC has correctly observed that "[t]he statute does not limit [the context of other cessations] to any specific time period." *See DeHart*, 50 Fed. Reg. at 36,171; *Pioneer Paper Stock*, 52 Fed. Reg. at 28,882; *Red Star*, AR at 1446. In *DeHart* and *Pioneer Paper Stock*, PBGC reviewed data beginning five years prior to the departing employer's cessation. *See DeHart*, 50 Fed. Reg. at 36,171; *Pioneer Paper Stock*, 52 Fed. Reg. at 28,882. However, in *Pioneer Paper Stock* the agency acknowledged that "[i]n other cases, the PBGC may find that other time periods are appropriate." *Pioneer Paper Stock*, 52 Fed Reg. at 28,882. And indeed, it did. In *Red Star*, the agency took a narrower approach, looking back only to the year prior to Red Star's cessation.

---

[2] QAS makes much of PBGC statement in its *Red Star* determination that the "cessation of contributions accounted for a decrease in [contribution base units] of approximately 16%." (Pl.'s Mot. at 18.) However, that 16% figure represented the decrease in contribution base units resulting from "the cessation of contributions to the Fund by Red Star, *considered together with* cessation by other employers." (AR at 1448 (emphasis added).) Thus, it supports this Court's conclusion that PBGC has not departed from its prior precedent by considering the cumulative impact of employer cessations in this case.

(AR at 1446.) In *Kane*, the agency took a broader approach, looking as far back as thirteen years prior to Kane's 1993 cessation with respect to certain considerations. *See* 63 Fed. Reg. at 1,512 (considering change in contribution base of the Fund and number of active employers from 1980-1995; considering number of employer cessations from 1986-1994; considering contribution rates from 1986-1995; considering unfunded vested benefits from 1992-1996). In light of those decisions, PBGC's consideration of data ranging from 2000 (seven years prior to QAS's cessation) to 2010 (three years after it) is consistent with its previous decisions.

Because the Court concludes that PBGC's determination in this case did not represent a departure from the approach used in its prior determinations, the Court will not set aside the determination as arbitrary and capricious on that basis.

### III. PBGC'S CONSIDERATION OF ALL NECESSARY FACTORS

QAS next argues that PBGC improperly failed to consider its argument that "no substantial damage to the Fund occurred because AJRS replaced QAS and filled the void left by its cessation." (Pl.'s Mot. at 21.) Plaintiff suggests that this was improper for two reasons. First, plaintiff argues that an agency's action is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of the problem," and "[w]hether another employer filled the void left by QAS is plainly an important aspect of the problem here." (*Id.* at 20.) Second, plaintiff claims that the statute clearly requires the agency to consider "whether other employers filled the void by rehiring the exiting employer's former employees and continuing to make contributions on their behalf." (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, May 13, 2013 [ECF No. 19] ("Pl.'s Opp'n") at 7.) In this instance, these two arguments essentially coalesce, since PBGC's explanation for not considering whether AJRS filled the void left by QAS's departure was that it was not required to consider that factor under the statute. (*See* AR at

1442 ("[T]he fact that a new employer may have performed similar covered work as Quality is not relevant to an analysis under ERISA § 4203(d).").)

The Court again concludes that it cannot resolve this question based on the statute under step one of *Chevron*. As an initial matter, the statute itself is silent as to how PBGC is to determine "substantial damage" and whether the entry of a new contributing employer should be factored into that determination. Moreover, reference to the legislative history and statutory context does not solve the query. As plaintiff correctly points out, there is language in the legislative history to suggest that Congress intended PBGC to consider whether the void left by one contributing employer was filled by another. (*See* Pl.'s Opp'n at 10.) In particular, in explaining the trucking industry exception, Senator Durenberger stated that "the contribution base of a plan in the trucking industry almost always will be protected because motor freight volume is relatively constant. When one employer leaves a plan, affected employees will almost always be reemployed by another employer who takes his place." 126 Cong. Rec. 23286 (Aug. 26, 1980). However, if Congress had intended the agency to rely on a departing employer's replacement by another contributing employer, it could have included language to that effect. Indeed, it did exactly that in the very next section of the statute. There, the statute describes when the sale of an employer's assets will constitute a withdrawal for purposes of imposing withdrawal liability. *See* 29 U.S.C. § 1384. The statute provides that a withdrawal will not be deemed to have occurred in such circumstances if, among other things, "the purchaser has an obligation to contribute to the plan with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute to the plan" and in fact does "provide[] to the plan for a period of 5 plan years." *Id.* § 1384(a)(1)(A), (B). In other words, Congress instructed the agency to consider this very factor in determining

withdrawal based on sale of assets under § 1384, but not based on cessation of operations under § 1383.

Given this ambiguity, the Court must move on to *Chevron*'s step two and determine whether the agency's interpretation of how it should determine "substantial damage" is reasonable. As noted, the legislative history and the statutory structure point in opposite directions. PBGC has chosen to follow one of those two directions. There can therefore be little dispute that the agency action in this case "reflects a reasonable interpretation of [the statute]." *Coal. For Common Sense in Gov't Procurement*, 707 F.3d at 317. As a result, the Court will not set aside PBGC's determination based on its failure to consider the fact that AJRS had replaced QAS as a contributing employer to the Fund.

## IV. PBGC'S CONSIDERATION OF IMPROPER FACTORS

QAS's next argument is that PBGC improperly relied on factors that Congress did not intend it to consider. (Pl.'s Mot. at 23.) Plaintiff insists that in determining whether a plan has suffered "substantial damage to its contribution base," 29 U.S.C. § 1383(d)(3)(B)(i), the agency is only permitted to consider the employer's cessation and any cessations by other employers, but nothing else. (Pl.'s Mot. at 23.) Thus, PBGC's consideration of other factors—most notably the plan's overall financial condition—rendered the agency's determination arbitrary and capricious. (*Id.* at 23-24.) PBGC responds that "it is only when a reduction in [contribution base units] is considered in the context of a plan's financial condition that it can be determined whether substantial damage has occurred." (Def.'s Mot. at 15.)

The Court agrees with PBGC. As already discussed, the statute itself is silent with respect to how the agency should determine whether "substantial damage to its contribution base" has occurred. And indeed, if Congress had intended PBGC to focus solely on the number

15

of contribution base units—perhaps the only economic metric directly attributable to an employer's cessation—it could have done so; instead, it mandated a broader consideration of whether the plan's contribution base was "substantially damaged." Thus, it simply cannot be said that considering the plan's overall financial condition at the time of an employer's cessation is a factor "which Congress has not intended [the agency] to consider." *State Farm*, 463 U.S. at 43.

Nor is the overall financial health of a plan "a matter irrelevant" to the question of whether the plan has been substantially damaged. *Judulang v. Holder*, 132 S. Ct. 476, 484 (2011). On the contrary, it is highly relevant to that question. As PBGC points out, a mere reduction in contribution base units "is not always detrimental to a plan's contribution base . . . if the current contribution base supports future benefits." (Def.'s Mot. at 15.) So again, the Court concludes that PBGC's determination cannot be faulted because the agency considered the plan's overall financial condition and the various other metrics that affect its financial well-being.

## V. PBGC'S ARTICULATION OF A SATISFACTORY EXPLANATION

Finally, QAS argues that PBGC failed to articulate a satisfactory explanation for its action. (Pl.'s Mot. at 24.) It is true that "[a] 'fundamental' requirement of administrative law is that an agency 'set forth its reasons' for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (quoting *Roelofs v. Sec'y of the Air Force*, 628 F.2d 594, 599 (D.C. Cir. 1980)). This requirement is codified at 5 U.S.C. § 555(e), which requires an agency to provide "a brief statement of the grounds for denial." The purpose of the rule is two-fold: it "not only ensures the agency's careful consideration of such requests, but also gives parties the

opportunity to apprise the agency of any errors it may have made and, if the agency persists in its decision, facilitates judicial review." *Tourus Records*, 259 F.3d at 737.

The D.C. Circuit has described the "brief statement" requirement as "minimal," *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), requiring only that the agency explain "why it chose to do what it did." *Tourus Records*, 259 F.3d at 737 (internal quotation marks and citation omitted). As this Court has recently noted, "[t]he agency explanations that the D.C. Circuit has branded too brief seem to be limited to single, conclusory sentences." *Remmie v. Mabus*, 898 F. Supp. 2d 108, 119-20 (D.D.C. 2012) (collecting cases).

Here, though far from a model of detail and clarity, PBGC's determination complied with the basic requirement that it provide a brief statement setting forth the reasons for its decision. The two-page determination clearly identified the materials it had reviewed, the factors it had considered, and six specific reasons in support of its conclusion that the Fund's contribution base had been substantially damaged. (AR at 2075-76.)

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: August 15, 2013